OPINION OF THE COURT
Analisa Torres, J.
If a person is merely standing in the lobby of a housing project building and there is no evidence of prior criminality at that location, are the police permitted to approach and question that individual for the purpose of determining whether he or she lives there? I hold that they are not.
Defendant, Jose Ventura, is charged with criminal possession of a controlled substance in the third degree (Penal Law § 220.16 [1]) and criminal trespass in the third degree (Penal Law § 140.10 [e]).
Defendant moves to suppress 29 ziplock bags of cocaine and $284 recovered by the police, on the ground that they are the fruit of an officer’s unlawful approach and questioning. Defendant also moves to suppress statements made to the police. On November 9 and 10, 2010, I conducted a hearing, pursuant to Mapp v Ohio (367 US 643 [1961]) and Dunaway v New York (442 US 200 [1979]). The People called Police Officer Jason Del Toro. I credit his testimony. Following are my findings of fact and conclusions of law.
Facts
Officer Del Toro, a nine-year veteran of the New York Police Department, investigates drug sales in lower Manhattan. He has made 500 narcotics-related arrests.
In the early evening of February 28, 2010, Del Toro and his partner, Detective Bender, entered the New York City Housing Authority (NYCHA) building located at 292 Delancey Street in Manhattan. Del Toro stated that they were there to conduct a “vertical” — a floor-by-floor patrol of the premises during which officers search for loiterers, drug users, people consuming alcohol and trespassers.
Del Toro testified that, unlike police procedures applicable to private apartment buildings, in housing projects officers may *589 question anyone they encounter to determine whether they are on the premises lawfully. Sometimes, at his discretion, Del Toro requires that purported residents provide identification or a key. These individuals, the officer explained, must prove that they are not trespassers. Persons claiming to be legitimate visitors must also supply corroboration.
Del Toro had been to 292 Delancey a handful of times. He offered the following information about the premises: the building, a multiple dwelling located in the Baruch Houses development, has a metal exterior door with a keypad on the left, a standard public housing lobby and an elevator. A “no trespassing” sign is posted on the outside of the building. Del Toro could not say how many floors it has. He does not know any residents. He had neither reviewed a list of tenants’ names nor seen photographs of them. The officer is not familiar with the building’s racial or ethnic makeup.
Del Toro did not state whether the building or the area is drug prone. Nor did he mention whether he was aware of any other prior criminal activity there.
The officer entered the premises at about 6:30 p.m. and observed defendant standing alone in the lobby. Del Toro could not recall whether defendant was coming or going or how he was dressed. Del Toro did not remember whether defendant was waiting for the elevator.
The officer testified that when he encountered defendant “[h]e was in the lobbyt,] I don’t recall him doing anything in particular.” Del Toro approached defendant and asked whether he resided in the building. Defendant replied that he was visiting a friend. When defendant did not supply a name and apartment number, Del Toro arrested him for trespassing on NYCHA premises.
Detective Bender searched defendant and recovered from his waistband 29 ziplock bags of cocaine. Del Toro performed a search and found $284 on defendant’s person.
Law
The guidelines for evaluating the propriety of police contact with civilians were set forth in People v De Bour (40 NY2d 210 [1976]). In that case, the Court of Appeals articulated a four-tiered, common-law analysis of police-civilian encounters. Each progressive level corresponds to an increasing degree of police intrusion upon a person’s liberty.
Level one allows an officer to approach an individual and inquire about basic, nonthreatening matters such as name, ad *590 dress and destination. This first level is known as a “request for information.” The police must have an articulable reason for the questioning, but the reason need not be indicative of criminality. (People v Hollman, 79 NY2d 181 [1992].) In a level two contact, a “police officer’s questions become extended and accusatory and the officer’s inquiry focuses on the possible criminality of the person approached.” (Hollman at 191.) This second level — more intrusive than a simple request for information but short of an actual seizure — is known as the “common law right to inquire” and requires that an officer have a “founded suspicion that criminal activity is afoot.” (De Bour at 223.) A level three contact allows the police to stop and detain a person when the officer has reasonable suspicion that the person is committing, has committed or is about to commit a crime. (Id.; CPL 140.50 [3].) Level three authorizes an officer to frisk a person for weapons where he reasonably suspects that there is danger of physical injury. Level four permits the police to take into custody and arrest a person, when the officer has “probable cause to believe that person has committed a crime.” (De Bour at 223.)
The law governing trespass in public housing, Penal Law § 140.10 (e), provides:
“A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property . . .
“where the building is used as a public housing project in violation of conspicuously posted rules or regulations governing entry and use thereof.”
A person who is standing in the vestibule of a NYCHA building that has a history of drug activity, may be approached by the police, questioned about residency and required to produce identification, even if that individual has not engaged in conduct indicative of criminality. (People v Hendricks, 43 AD3d 361 [1st Dept 2007].) Such questioning is considered a level one contact under De Bour. (Id. at 363.) A person’s mere presence in a public housing building known for drug activity is, therefore, sufficient to justify an officer’s inquiry into whether the individual is there lawfully.
Discussion
The People concede that there is no evidence of drug-related crime at 292 Delancey. They argue, however, that, unlike private apartment houses, in NYCHA buildings — even those that are *591 not known for criminality — officers “have a little bit more leeway in their interactions with the public,” because Penal Law § 140.10 (e) specifically prohibits trespassing in housing projects. In other words, the People contend that mere presence in a NYCHA building is reason enough to justify a De Bour level one stop. The prosecution is incorrect.
In 1992, the Legislature criminalized trespass in public housing buildings, by adding subdivision (e) to the crime of criminal trespass in the third degree. The purpose of the bill was to improve security in housing projects. The introducer memorandum states that the new provision was necessary to close a loophole in existing laws which were ineffective against would-be trespassers on NYCHA property, because public housing was considered open to the public (Legis Mem in Support, Bill Jacket, L 1992, ch 434, at 8).
Neither the plain language of the statute nor its legislative history suggests that the Legislature intended to eliminate or relax De Bour level one protections in housing projects. No matter the location, luxurious or modest, the police must have “some objective credible reason” (JDe Bour at 223 [emphasis added]) to request information about a person’s residency. Officers conducting vertical patrols are not permitted to select individuals for questioning based on presence alone. At a minimum, there must be evidence of prior criminality in the building.
To the extent that Del Toro’s description of vertical patrols is accurate, that in public housing buildings the police routinely engage in random, unjustified questioning — and there is evidence that they do — the practice would amount to a systematic violation of De Bour. (See Adam Carlis, The Illegality of Vertical Patrols, 109 Colum L Rev 2002 [2009].)
Conclusion
The officer’s initial inquiry, based solely on defendant’s presence in the lobby of a NYCHA building, and the resulting arrest and search were unlawful. It follows, therefore, that defendant’s statements and the physical evidence recovered by the police are the fruits of the poisonous tree and must be suppressed.
Accordingly, defendant’s motion is granted in its entirety.